[Cite as *In re S.O.*, 2022-Ohio-3823.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE S.O., | : | |
| | | No. 111417 |
| Minor Child | : | |
| | | |
| [Appeal by Mother] | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 27, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-20-910718

## *Appearances:*

Edward F. Borkowski, Jr., *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Appellant-mother ("Mother") appeals from the judgment of the Cuyahoga County Common Pleas Court, Juvenile Division, granting permanent custody of her minor child, S.O., to appellee, the Cuyahoga County Department of Children and Family Services ("CCDCFS" or the "agency"). For the reasons that follow, we affirm.

## I.  Background

{¶ 2}  Mother gave birth to S.O. in September 2020.  Because S.O.'s older sibling had been adjudicated neglected and was in the agency's temporary custody, S.O. was removed from Mother's custody on September 11, 2020, and placed in the predispositional temporary custody of CCDCFS.

{¶ 3}  On December 23, 2020, CCDCFS refiled a complaint alleging that S.O. was dependent and requesting predispositional temporary custody.[1]  By journal entry dated December 24, 2020, S.O. was recommitted to the predispositional temporary custody of CCDCFS.  After a subsequent hearing, S.O. was adjudicated a dependent child and committed to the temporary custody of the agency.

{¶ 4}  In August 2021, CCDCFS filed a motion to modify temporary custody to permanent custody.  After a trial on March 7, 2022, the trial court granted the agency's motion for permanent custody and terminated Mother's parental rights.  Mother appeals from this judgment, raising as her single assignment of error that the trial court abused its discretion in committing S.O. to the permanent custody of CCDCFS because its judgment was against the manifest weight of the evidence.

## II.  Trial Testimony

{¶ 5}  CCDCFS extended service case worker Jessica Sanchez testified that she was assigned to the case in December 2020.  She said that the agency developed a case plan for Mother to promote reunification with S.O. and address issues related

---

[1] The original complaint was filed on September 11, 2020, and S.O. was committed to the predispositional temporary custody of the agency.  The matter was later dismissed because it could not be completed within the statutory timeframe.

to Mother's housing needs, mental health issues, substance use, domestic violence issues, and anger management.

{¶ 6} Sanchez testified that Mother was diagnosed with bipolar disorder, PTSD, and anxiety. She said that Mother was referred to several mental health providers but was inconsistent in engaging with them. She said that Mother became reengaged with Life Solutions, a mental health services provider, in August 2021 and, as of trial, had been "actively engag[ed]" with Life Solutions since February 2022.

{¶ 7} Sanchez testified that Mother started domestic violence services in November 2020 but disengaged with the provider in October 2021 upon learning that this court had affirmed the trial court's award of permanent custody of S.O.'s older sibling to the agency. Sanchez said that Mother unsuccessfully engaged with several other domestic violence service providers after this time (she was terminated by one provider for her angry outbursts during sessions and by another for lack of attendance) but that, shortly before trial, Mother told Sanchez that she had reengaged with a service provider and was taking two-hour virtual classes every week.

{¶ 8} With respect to housing, Sanchez testified that Mother had obtained housing at a YMCA facility in June 2020 and continued to reside there as of trial. She testified that Mother did not always stay there, however, because she often stayed with her boyfriend in Akron. Sanchez testified that she had been unable to visit Mother's home since June 2021 because Mother was never at home when she

tried to visit and attempted virtual visits had been unsuccessful. Sanchez said that the agency had concerns about Mother's safety at her home and, thus, S.O.'s safety if he were to live there because Mother had reported that she had been assaulted by other people who live in the building.

{¶ 9} With respect to substance use, Sanchez testified that although the agency initially had concerns about Mother's use of prohibited substances, Mother had negative urine and hair screens in June 2021 after which substance use was removed from the case plan objectives.

{¶ 10} Sanchez testified that Mother was initially consistent in communicating with her but that she had difficulty communicating with Mother beginning in June 2021 because Mother's phone service was sporadic and she used several different telephone numbers. Sanchez said that as of trial in March 2022, Mother had not spoken with her between January 2022, when Mother became angry during a telephone call and hung up on her, and the Friday immediately prior to trial.

{¶ 11} Sanchez testified that Mother was initially scheduled for supervised visitation with S.O. at the agency for two hours every other week and that Mother attended the visits, although she did not always appear on time. Sanchez said that when the visits changed to virtual visits between December 2020 and February 2021 due to Covid restrictions, Mother was not as consistent in attending the visits and was at times difficult to reach. Sanchez testified that Mother engaged in all in-person visits after they resumed, although she did not always arrive on time.

Sanchez said that she observed Mother's visits with S.O. and that although Mother "appears to have a strong love for her child," Mother was unable to focus on and give attention to S.O. during the visits, who as a young toddler needs significant attention and direction. Sanchez said that Mother also had difficulty maintaining her composure during the visits when she became frustrated with S.O.'s behavior. Sanchez testified that on at least one occasion in March 2021, Mother's behavior became so erratic that she had to be escorted out of the building by a sheriff's deputy.

{¶ 12} Sanchez testified that S.O.'s alleged father was incarcerated when the case was assigned to her. She said that he was included on the case plan but that he never established paternity or engaged in any of the offered services after he was released from prison in March 2021, despite her attempts to contact him. Sanchez said that he was reincarcerated as of the time of trial.

{¶ 13} Sanchez testified that granting permanent custody to the agency was in S.O.'s best interest because S.O. had been in agency custody nearly all his life and Mother could not provide a safe, stable environment for him. She said that Mother had not completed her case plan services despite the significant amount of time she had to do so, and that the agency had concerns about Mother's and S.O.'s safety in Mother's home due to her mental health and anger issues and inability to focus. Sanchez said the agency was also concerned about Mother's ability to financially provide for S.O., especially in light of a recent report from Mother's therapist that Mother's ongoing anger issues had a "significant impact" on her ability to get and retain employment. Sanchez testified that the agency was granted permanent

custody of S.O.'s older sibling in March 2021, due to many of the same issues relevant to S.O.'s case.

{¶ 14} Sanchez testified that S.O. is an active one-and-one-half-year-old child who needs someone "to be there and provide care 24/7" and that she believed Mother was unable to provide for S.O.'s everyday needs and care. She said that Mother "had not gotten better over time" and her behavior at the visits demonstrated that she was not able to internalize what she had learned about her anger management. She said that S.O.'s foster mother had expressed interest in adopting S.O. should permanent custody be granted to the agency, and that S.O. was "very bonded" to both the foster mother and her 15-year-old daughter and "very loved" in the home.

{¶ 15} Renae Cameron, an extended service worker at CCDCFS, testified that her experience with Mother dated back to 2015, when Mother was in a permanent planned living arrangement with the agency, and continued after Mother had her first child. Cameron said that because of that experience, she was asked to assist with determining case plan objectives and supervising Mother's visits with S.O.

{¶ 16} Cameron testified that Mother was often upset during the visits and focused on her phone instead of her son, allowing him to wander off and not engaging with him. Cameron said Mother "needs a lot of guidance, redirection, and attention for her focus to be on her son," and even though she spoke often with Mother about these issues, Mother never changed her behavior and ignored

Cameron's efforts to direct her toward more appropriate parenting behaviors. Cameron described an incident at one visit where Mother was on her phone and, although Cameron encouraged Mother to engage with S.O., she just kept talking on her phone as S.O. wandered down the hall. Cameron said that she had to tell Mother at a visit as recently as December 2021 to put the phone down and attend to the needs and safety of S.O. She also described an incident where Mother became upset at S.O. and began "cussing and yelling, saying the baby don't f***ing know me," and then, despite being "in the middle of changing his diaper just left out of the bathroom." Camerson said that even after S.O. had calmed down, Mother was still "more engaged on a video call with somebody that she identified as his aunt versus him." Cameron described another incident where security had to be called because Mother was "cussing, yelling, throwing Baby [S.O.'s] toy. Telling him to go to his other mommy. Cussing at staff, asking them what the F they were looking at. Trying to fight the security, trying to fight staff in the building." Cameron said that because of how quickly Mother "escalated and how quickly she gets provoked," security personnel made sure they were available or close by for all visits.

{¶ 17} Cameron said she did not believe that Mother can appropriately care for S.O. She testified that "I've seen her with her child, and I see the lack of being able to show what she's benefitted. She's completed certificates with parenting classes. She can verbalize what she's learned. But from my observations and the visitations with them, myself, she hasn't been able to implement it." Cameron also testified that S.O. did not appear to have a strong bond with Mother.

**{¶ 18}** S.O.'s foster mother testified that S.O. is very bonded with her and her 15-year-old daughter. She said that she attended S.O.'s visits with Mother and although "there's no doubt" that Mother loves S.O., she was often concerned for S.O.'s safety during the visits because S.O. would sometimes wander off and Mother failed to react. She said that she kept Mother informed of all of S.O.'s medical appointments and information but Mother never engaged in the child's medical care or asked to participate in his doctor's appointments.

**{¶ 19}** April Griffin, a case manager at Life Solutions, testified for Mother. She said that Mother had been a client at Life Solutions since August 2021 and had "improved tremendously." Griffin said she had connected Mother with a therapist and assisted her with getting a computer and phone service. She said that Mother sometimes obtained work through a temporary employment agency and sometimes volunteered in the office at Life Solutions. Griffin said that she observed one visit by Mother with S.O. in September 2021, and did not see any problems. She said that she was not in favor of permanent custody with the agency because Mother "loves her child" and "really wants her child."

**{¶ 20}** Nicole Morton, a psychotherapist at Life Solutions, also testified for Mother. Morton said that she began psychotherapy with Mother in December 2021, and anger management counseling in late January 2022. Morton acknowledged that Mother has a "severe and persistent mental illness" that will likely require psychotherapy for the rest of Mother's life. Morton admitted that just as in Mother's visitations with S.O., her phone had been a distraction during therapy sessions.

Morton testified that a lack of concentration and focus can be a symptom of Mother's mental illness and that Mother requires someone to redirect her attention when she is unfocused. Morton testified that she "was not comfortable" offering her opinion as to whether it would be safe for S.O. to be in Mother's care or what would happen if no one was present to redirect Mother's focus to S.O. Morton acknowledged that although Mother had made some progress, she needed more anger management treatment.

{¶ 21} The record reflects that Mother had several angry outbursts during trial, some of which resulted in her departure from the courtroom during the proceedings and ultimately required the presence of multiple law enforcement officers in the courtroom. In recommending permanent custody at the conclusion of the trial, S.O.'s guardian ad litem stated:

> I have been present through both this case and the sibling's case where [Mother] has, on regular occasions, gotten up, stormed out, amongst a course of vulgarities directed at just about anybody. And that concerns me having a child raised in that environment. * * * [Mother] is still engaged in dangerous activities,[2] does not displayed [sic] the kind of requisite mental health or ability to manage her anger that I would feel comfortable saying that reunification is possible.

(Tr. 157.)

## III. Law and Analysis

{¶ 22} A trial court's decision to award permanent custody will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re*

---

[2] The guardian ad litem was referring to incidents where Mother called 911 reporting that she had been threatened with a gun at her apartment and to instances when Mother rode in vehicles where there were loaded firearms. (Tr. 157.)

*Adoption of Lay*, 25 Ohio St.3d 41, 42, 495 N.E.2d 9 (1986). Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *State v. Scheibel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

{¶ 23} R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The movant must prove by clear and convincing evidence that (1) granting permanent custody of the child to the agency is in the best interest of the child, and (2) either the child (a) cannot be placed with either parent within a reasonable time or should not be placed with the child's parents, (b) is abandoned, (c) is orphaned and no relatives are able to take permanent custody of the child, or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1).

{¶ 24} "Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to cause a trier of fact to develop a firm belief or conviction as to the facts sought to be established." *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24, citing *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). "Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." *In re T.S.* at ¶ 24, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

{¶ 25} In its journal entry granting permanent custody, the trial court found that S.O. cannot be placed with either parent within a reasonable time or should not be placed with his parents. In making this determination, the juvenile court considered the factors set forth in R.C. 2151.414(E) and concluded that notwithstanding reasonable case planning and efforts by the agency to assist Mother to remedy the conditions that led to S.O.'s removal, she had failed to remedy the conditions that caused S.O. to be placed outside her home. R.C. 2151.414(E)(1). The juvenile court further found that Mother has chronic mental and emotional illnesses that are so severe that they make her unable to presently, or within one year of trial, provide an adequate permanent home for S.O. R.C. 2151.414(E)(2). The court further found that Mother had demonstrated a lack of commitment to S.O. by her actions that demonstrated an unwillingness to provide an adequate permanent home for him. R.C. 2151.414(E)(4). The court also found that S.O.'s alleged father had abandoned him and that Mother's parental rights regarding S.O.'s sibling had been involuntarily terminated. R.C. 2151.414(E)(10) and (11). The court also found that S.O.'s alleged father was incarcerated and that Mother had multiple inappropriate outbursts during trial. R.C. 2151.414(E)(16).

{¶ 26} Mother does not challenge any of these findings; she challenges only the juvenile court's determination that permanent custody was in S.O.'s best interest. Nevertheless, we find that the manifest weight of the evidence supports the juvenile court's findings.

{¶ 27} S.O.'s alleged father never established paternity and had no involvement with S.O. during the pendency of the case. With respect to Mother, the evidence was clear and convincing that she had failed to remedy the conditions that led to S.O.'s removal from the home. She had not completed her case plan services with regard to her mental health or anger management issues and even though she had completed some parenting classes, she did not demonstrate an ability to apply what she had learned to meet the needs and safety of S.O. The evidence also demonstrated that Mother has chronic mental and emotional illnesses that prevent her from providing an adequate permanent home for S.O. Mother's therapist acknowledged at trial that Mother had been diagnosed with a "severe and persistent mental illness" that will likely require a lifetime of treatment, and Mother's outbursts during trial, ultimately requiring the presence of multiple law enforcement officers in the courtroom, demonstrated the ongoing nature of her anger management issues. The trial record also demonstrates that Mother's parental rights regarding S.O.'s sibling were involuntarily terminated in March 2021 due to, among other issues, her ongoing and unresolved mental health issues. *See* exhibit No. 4. Accordingly, the trial court properly determined that S.O. could not be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 28} Having determined that S.O. could not be placed with either parent within a reasonable time or should not be placed with them, the trial court was then required to make a "best interest" determination pursuant to R.C. 2151.414(D).

{¶ 29} R.C. 2151.414(D) requires that in determining the best interest of the child, the court must consider all relevant factors, including but not limited to (1) the interaction and interrelationship of the child with the child's parents, sibling, relatives, foster parents, and out-of-home provides, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors in R.C. 2151.414(E)(7) through (11) are applicable. Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent custody determination, "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. This court has stated that only one of these enumerated factors needs to be resolved in favor of the award of permanent custody. *In re T.B.*, 8th Dist. Cuyahoga No. 110130, 2021-Ohio-2448, ¶ 25, citing *In re Moore*, 8th Dist. Cuyahoga No. 76942, 2000 Ohio App. LEXIS 3958, 12 (Aug. 31, 2000).

{¶ 30} The juvenile court's journal entry granting permanent custody demonstrates that in making its best interest determination after hearing the evidence and testimony presented at trial, the court considered all relevant factors, including those listed in R.C. 2151.414(D)(1)-(5).

{¶ 31} Regarding interactions and relationships, the trial court found that S.O. was extremely bonded with his foster mother — who had cared for him since

his birth — and her daughter. The court found that although Mother visited with S.O. and evidently loves him, S.O. did not have a significant bond with her and, further, that Mother spent a significant amount of time on her phone during the visits instead of interacting with him. The court found that S.O.'s father had never visited with him.

{¶ 32} Regarding the wishes of the child, the court found that S.O. was too young to express his wishes but that his guardian ad litem recommended permanent custody. With respect to custodial history, the court found that S.O. had been in agency custody since birth, remaining in the same foster home at all times, and had never lived with or been cared for by Mother. Regarding S.O.'s need for a legally secure placement and whether that could be achieved without the grant of permanent custody, the court found that S.O. "deserves a safe, stable and nurturing environment where all of his needs can be met and he can thrive" and "this cannot be achieved with Mother or alleged Father." Finally, with respect to whether any of the factors in R.C. 2151.414(E)(7) through (11) applied, the court found that the alleged father had abandoned S.O. and that Mother's parental rights with respect to a sibling of S.O. had previously been involuntarily terminated. *See* R.C. 2151.414(E)(10) and (11), respectively.

{¶ 33} The record clearly and convincingly supports the trial court's best interest determination. The evidence is clear that the alleged father had no involvement whatsoever with S.O. and had abandoned him. The evidence is also

clear that although Mother apparently loved S.O., she could not provide a safe and secure environment for him where he could thrive.

{¶ 34} Mother contends, however, that the trial court improperly weighed the evidence to reach its conclusion that permanent custody was in S.O.'s best interest. For example, she contends that the evidence showed she was not always distracted by her phone during her visits with S.O. and that even if the phone was a distraction, concentration and focus issues are merely symptoms of her mental health issues. She also contends that the evidence showed that she did, in fact, have "a bond" with S.O. and, thus, she should not be penalized because S.O. naturally had a stronger bond with his foster mother, who had cared for him from birth. She also contends that S.O.'s custodial history should have weighed in her favor, rather than in favor of permanent custody, because there were Covid restrictions in place during part of the pendency of the case and she could not fully engage in visits with S.O. during this time or in her case plan services. Mother contends that if the trial court had "properly weighed" the evidence, it would have reached a conclusion other than granting permanent custody. Mother's arguments are without merit.

{¶ 35} In arguing that the trial court erred in improperly weighing the evidence, Mother is asserting that her view of the evidence should be substituted for that of the trial court. But "it is for the trial court to resolve disputes of fact and weigh the testimony and credibility of the evidence." *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 23, 550 N.E.2d 178 (1990). Furthermore, when reviewing the trial court's custody decision, an appellate court must make "'every reasonable presumption in

favor of the lower court's judgment and finding of facts.'" *In re J.C.*, 8th Dist. Cuyahoga No. 106272, 2018-Ohio-2234, ¶ 38, quoting *In re Brodbeck*, 97 Ohio App.3d 652, 647 N.E.2d 240 (3d Dist.1994). Thus, "[we] will not overturn a permanent custody order unless the trial court has acted in a manner that is arbitrary, unreasonable, or capricious." *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994).

{¶ 36} After careful consideration of the evidence presented at the permanent custody hearing, we find there is clear and convincing evidence in the record to support the juvenile court's findings under R.C. 2151.414(D)(1) and its determination that permanent custody was in S.O.'s best interest. Although Mother may disagree with the trial court's determination, it is not against the manifest weight of the evidence and there is no indication in the record that the trial court's decision was arbitrary, capricious, or unreasonable.

{¶ 37} Mother also contends that the trial court improperly granted permanent custody because S.O.'s need for a secure placement could have been met without the grant of permanent custody, especially because she had been making progress on her case plan objectives. Implicit in Mother's argument is an assertion that the trial court could have extended temporary custody to the agency to offer her more time to work on her case plan objectives. This argument is likewise without merit. A temporary custody order expires one year after the earlier of the date of which the complaint was filed or the child was first placed in shelter care and no more than two years after the earlier of these dates if a motion for extension was

filed. R.C. 2151.353(G); *In re R.A.*, 8th Dist. Cuyahoga No. 110541, 2021-Ohio-4126, ¶ 27. A court may grant a six-month extension of temporary custody only if a motion for extension has been filed and there has been significant progress on the case plan. R.C. 2151.415(D)(1).

{¶ 38} S.O. had been in the agency's custody since September 11, 2020, and no motion for extension of temporary custody was ever filed. Thus, although the expiration of the temporary custody order dated September 2021 was tolled by the filing of the permanent custody motion in August 2021, it is apparent there was no more time left on the initial term of temporary custody at the time of trial in March 2022. Moreover, as a practical matter, Mother had already gained the benefit of a six-month extension (August 2021 to March 2022) due to the tolling of the temporary custody order. She failed during this time, however, to demonstrate sufficient progress on her case plan objectives to justify any further extension. Accordingly, there is nothing in the record to suggest that an extension would have been in S.O.'s best interest, that Mother was likely to make significant case plan progress, or that reunification was likely even if a motion for extension had been filed.

{¶ 39} As discussed above, we find that the trial court did not abuse its discretion in determining that permanent custody of S.O. should be awarded to CCDCFS. The trial court's determination is supported by clear and convincing evidence and the assignment of error is therefore overruled.

{¶ 40} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

FRANK DANIEL CELEBREZZE, III., P.J., and
MARY J. BOYLE, J., CONCUR